**STATE of Minnesota, Respondent,**

v.

**Marshall Donald MURPHY, Appellant.**

**No. C0–84–2128.**

Supreme Court of Minnesota.

Jan. 31, 1986.

C. Paul Jones, State Public Defender, Brian I. Rademacher, Asst. State Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Thomas J. Johnson, Hennepin Co. Atty., Vernon E. Bergstrom, Chief, Appellate Section, Paul R. Jennings, Asst. Co. Atty., Minneapolis, for respondent.

AMDAHL, Chief Justice.

On September 14, 1984, defendant Marshall Donald Murphy was convicted of first degree murder. Essential to the state's case was evidence of a confession defendant made to his probation officer who was supervising defendant in connection with an unrelated matter. This confession was the subject of extensive pretrial litigation which included a ruling by the United States Supreme Court that the confession was not compelled within the meaning of the privilege against compelled self-incrimination under the fifth amendment to the United States Constitution. *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). Defendant appeals from the judgment of conviction urging: (1) the confession was obtained in violation of his privilege against compelled self-incrimination under article 1, section 7 of the Minnesota Constitution; (2) the evidence was insufficient to prove rape as required by the felony murder statute under which he was convicted; (3) the evidence was insufficient to prove the homicide took place "while" the rape was occurring; (4)

the trial court's refusal to submit third-degree murder as a lesser included offense denied defendant a fair trial; and (5) the trial court responded improperly to a question from the jury, depriving defendant of a fair trial. We affirm.

On October 29, 1974, Sherrie Cole and her friend, Pam McGee, both teenagers, accompanied defendant and another man, both in their twenties, to a bar in South Minneapolis. Near midnight, Cole, McGee, and defendant left the bar and walked to McGee's home several blocks away. Leaving McGee there, Cole and defendant walked off toward Cole's house approximately 12 blocks away.

On November 21, 1974, a bridgeworker found Cole's nude, partially decomposed body covered with brush on the south bank of the railroad tracks near 29th Street and Cedar Avenue in South Minneapolis. This area is located between McGee's house and Cole's house. Cole's clothing was scattered about the area and no identification was found. A pathologist concluded that manual strangulation was the cause of death and placed the time of death at approximately 3 weeks before the body was discovered. He noted several wounds on her left hand, caused by a sharp instrument, which he characterized as "defensive wounds." Cole had also been cut on the chin and forehead and her jaw was fractured. The pathologist placed the time of the injuries at or shortly before death. A sexual assault examination was negative; a test for the presence of sperm was impossible due to the condition of the body.

Police officers questioned defendant concerning Cole's death on three occasions. Although defendant's roommate had turned over to the police a notebook containing Cole's identification cards which he found in his and defendant's attic, they were unable to gather enough evidence on which to charge defendant.

In 1980, defendant pled guilty to a charge of false imprisonment in connection with a prosecution for criminal sexual conduct unrelated to this matter. He was sentenced to 3 years' probation with Mara Widseth eventually appointed as his probation officer. The terms of probation included that defendant pursue a course of treatment at Alpha House,[1] report to his probation officer as she directed, and "be truthful" with her "in all matters." Failure to comply with this order could constitute grounds for revocation of probation.

In July 1981, Widseth discovered that defendant had discontinued his course of treatment, but after discussing the matter with him, she decided that treatment was no longer necessary. In September 1981, an Alpha House therapist informed Widseth that defendant had admitted during therapy that he had committed a rape and murder in 1974 but was never charged for lack of evidence. After Widseth discussed this information with her superior and determined that she must turn it over to the police, she sent a letter to defendant which read, "To further discuss a treatment plan for the remainder of your probation, I am requesting that you contact me upon your receipt of this letter to set [up] an appointment."

■ Defendant met with Widseth in her office in late September. She confronted defendant with the information she had received and he reacted with anger that the therapist had breached his confidence. He said he felt like calling an attorney. Widseth responded that he would have to deal with that outside of the office and that her main concern was the possibility that defendant would need further treatment because of the relationship between the two incidents.[2]

---

1. Alpha House is a treatment center for sex offenders.

2. At the omnibus hearing, Widseth testified that she understood defendant's statement not as an immediate request for counsel, but as a means of recourse against the therapist for the breach of defendant's confidence. Defendant, however,

testified that he believed he should have an attorney present. Even assuming defendant's version to be true, since the confession was not obtained during a custodial interrogation, *Minnesota v. Murphy*, 104 S.Ct. at 1144; *State v. Murphy*, 324 N.W.2d 340 at 344, and formal judicial proceedings had not been initiated, the

Defendant tried to dissuade Widseth from imposing more treatment on him by maintaining his innocence on the false imprisonment charge and arguing that the rape-murder arose from his heavy drug use which he had since discontinued. He then confessed to the rape-murder in detail. Widseth urged defendant to turn himself in to the police but he refused. She then gave the police this information and defendant was arrested.

At the omnibus hearing, defendant moved to suppress evidence of the confession on the ground that it was obtained in violation of his fifth amendment privilege against compelled self-incrimination under the United States Constitution. The trial court denied defendant's motion but certified the question to this Court as important and doubtful under Minn.R.Crim.P. 28.03. We reversed the trial court and remanded the case for trial holding, as a matter of federal constitutional law, the probation officer's failure to warn defendant of his constitutional rights before she questioned him bars the use of his confession at trial. *State v. Murphy*, 324 N.W.2d at 344.

The United States Supreme Court granted the state's petition for a writ of certiorari and reversed. *Minnesota v. Murphy*, 104 S.Ct. 1136. The Supreme Court held that the confession was not obtained in a coercive setting and was not compelled within the meaning of the fifth amendment. *Id.* at 1149. The case was tried, the confession admitted through Widseth's testimony, and defendant was convicted by a jury of first-degree murder. Defendant appeals from the judgment entered.

■ 1. Defendant's primary challenge to his conviction is that the evidence of his confession to Widseth is inadmissible under article 1, section 7 of the Minnesota Constitution. This issue is properly before us as our prior ruling rested solely on federal constitutional grounds. *State v. Murphy*, 324 N.W.2d at 344, 345. The Minnesota Constitution provides, "No person shall * *

be compelled in any criminal case to be a witness against himself." Minn. Const. art. 1, § 7. The provision is identical to the self-incrimination clause in the fifth amendment to the United States Constitution.

Although this court has the power to provide broader individual rights under the Minnesota Constitution than are permitted under the United States Constitution, *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 81, 100 S.Ct. 2035, 2040–41, 64 L.Ed.2d 741 (1980); *O'Connor v. Johnson*, 287 N.W.2d 400, 405 (Minn.1979), we decline to do so in this case. Our first decision in this case was based entirely on our reading of United States Supreme Court cases construing the federal constitution. *See State v. Murphy*, 324 N.W.2d at 344, 345. We primarily relied on *Roberts v. United States*, 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980), in which the Court declared:

> The Fifth Amendment privilege against compelled self-incrimination is not self-executing. *At least where the government has no substantial reason to believe that the requested disclosures are likely to be incriminating*, the privilege may not be relied upon unless it is invoked in a timely fashion.

*Id.* at 559, 100 S.Ct. 1363–64 (emphasis added). We concluded that "an exception must be made on the facts of this case to the general rule requiring a timely claim of the privilege." *State v. Murphy*, 324 N.W.2d at 344.

The Supreme Court reversed our decision and held that "the probation officer's knowledge and intent have no bearing on the outcome of this case." *Minnesota v. Murphy*, 104 S.Ct. at 1145. The Court, therefore, has now made clear, as a matter of federal constitutional law, that the intent or knowledge of the government official has no bearing on whether a self-incriminating statement will be deemed "compelled."

---

questioning by Widseth did not violate defendant's right to counsel under either the fifth or sixth amendments. *See United States v. Fitterer*,

710 F.2d 1328, 1333 (8th Cir.1983); *City of Burnsville v. Marsyla*, 349 N.W.2d 829, 830 (Minn.1984).

■ We have previously noted that since the federal and state self-incrimination constitutional provisions are identical, a United States Supreme Court interpretation of the federal provision is of inherently persuasive, although not compelling, force. *State v. Fuller,* 374 N.W.2d 722, 727 (Minn. 1985).

■ Our question thus becomes whether the unique relationship between probationer and probation officer as seen in the light of the philosophy of the Minnesota criminal justice system requires us to adopt a view contrary to that expressed by the United States Supreme Court in this very case. We conclude that it does not and we thus hold that the interpretation given by the United States Supreme Court of the privilege against self-incrimination under the federal constitutional provision is also a correct statement of the law under article 1, section 7 of the Minnesota Constitution.

■ 2. Defendant's second claim is that there was insufficient evidence of rape in the case and he was therefore wrongfully convicted of first-degree felony-murder. In reviewing this challenge, we must interpret the evidence in the light most favorable to the verdict. *State v. Parker,* 353 N.W.2d 122, 127 (Minn.1984). If we conclude that the jury, "acting with due regard for the presumption of innocence and for the necessity of overcoming it by proof beyond a reasonable doubt, could reasonably conclude that defendant was proven guilty of the offense charged, a reviewing court will not disturb its verdict." *State v. Norgaard,* 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965).

■ The evidence establishing a rape is substantial. Widseth testified that defendant told her he forced Cole into an alley at knifepoint: "He said that while there in the

alley, he raped her. After he raped her he stood up. When he stood up he looked back at her. He said that she looked so scared that he then killed her." To a layperson, especially one convicted of a sex-related offense, the word "rape" means nonconsensual sexual intercourse. Ample evidence corroborates the conclusion that defendant in fact raped Cole within the legal meaning of the word. First, he told Widseth that he raped Cole and then "stood up." Second, all of Cole's clothing had been removed. Finally, Cole's body revealed signs of considerable violence, including a fractured jaw, facial lacerations, and defensive-types wounds on her hands.

We note that the statute in effect at the time of Cole's death required a conviction of first-degree murder for one who "[c]auses the death of a human being while committing *or attempting* to commit rape or sodomy with force or violence." Minn.Stat. § 609.185(2) (1974) (emphasis added). The evidence clearly supports, at the very least, a finding of an attempted rape.

■ 3. Defendant's third contention is that the evidence was insufficient to prove he killed Cole "while" he was raping her. Minn.Stat. § 609.185(2) (1974). In Minnesota, the felony-murder rule is applicable where the "felony and the killing * * * are parts of one continuous transaction." *Kochevar v. State,* 281 N.W.2d 680, 686 (Minn.1979). In this case, defendant killed Cole immediately following the rape to conceal his crime. This killing falls within the same continuous criminal act as the rape and thus falls within the scope of our felony-murder statute.[3] Many states have either limited or abolished the felony-murder rule for policy reasons. *See People v. Aaron,* 409 Mich. 672, 699–707 & nn. 45–85, 299 N.W.2d 304, 312–16 & nn. 45–85 (1980)

---

3. Most jurisdictions that recognize the felony-murder doctrine support the view that a killing by one trying to escape from or conceal a felony where there has been no break in the chain of events between the felony and the killing is within the scope of the felony-murder rule. *E.g., Bizup v. People,* 150 Colo. 214, 371 P.2d 786, *cert. denied,* 371 U.S. 873, 83 S.Ct. 144, 9 L.Ed.2d 112 (1962); *Parson v. State,* 222 A.2d

326, 332 (Del.1966), *cert. denied,* 386 U.S. 935, 87 S.Ct. 961, 17 L.Ed.2d 807 (1967); *State v. Perry,* 161 Mont. 155, 505 P.2d 113 (1973). Thus, even though the underlying felony may be complete, the felony-murder rule may still apply. *E.g., State v. Lashley,* 233 Kan. 620, 664 P.2d 1358 (1983); *Haskell v. Commonwealth,* 218 Va. 1033, 243 S.E.2d 477, 483 (1978).

(setting forth thorough discussion of this trend). Our legislature, however, has recently expanded the scope of the felony-murder statute by adding several felonies to the first-degree murder statute, Act of April 30, 1981, c. 227, § 9, 1981 Minn.Laws 1009 (codified at Minn.Stat. § 609.185(3) (1984)), and upgrading a killing during a commission of other felonies from third-to second-degree murder. *Id.*, § 10, 1981 Minn.Laws 1010 (codified at Minn.Stat. § 609.19(2) (1984)). Today's holding conforms with clear legislative intent.

■■■ 4. Defendant also challenges the trial court's refusal to submit third-degree murder to the jury as a lesser-included offense. The determination of what, if any, lesser offenses should be submitted to the jury lies with the sound discretion of the trial court, *LaMere v. State*, 278 N.W.2d 552, 558 (Minn.1979), but where the evidence warrants such an instruction, it must be given. *State v. Lee*, 282 N.W.2d 896, 899 (Minn.1979). The test to be applied is whether the evidence provides a rational basis for an acquittal on the offense charged and a conviction on the lesser offense. *State v. Leinweber*, 303 Minn. 414, 422, 228 N.W.2d 120, 125–26 (1975). Therefore, proof of the elements which differentiate the two crimes must be sufficiently in dispute so that a jury may make this distinction. *State v. Adams*, 295 N.W.2d 527, 532 (Minn.1980).

■■■ Defendant argues that the jury could have found he engaged in indecent liberties with Cole, not rape, which would constitute an element of third-degree felony-murder. Minn.Stat. § 609.195(2) (1974). As noted above, the evidence clearly supports a finding that defendant raped or attempted to rape Cole with force or violence and defendant offered no proof of mere sexual contact to rebut this uncontroverted evidence. *See State v. McDonald*, 312 Minn. 320, 321, 251 N.W.2d 705, 706 (1977). The trial court properly denied defendant's request.

5. Defendant's final claim is that he was denied a fair trial because the trial court erred in responding to a question from the jury during deliberations. In its final instructions, the trial court said, "The statutes of Minnesota provide that whoever causes the death of a human being while committing or attempting to commit rape or sodomy with force and violence is guilty of murder in the first degree." The court did not define the term "while." After deliberating a short time, the jury sent the court a question asking for a definition of "while." Over defendant's objection, the court instructed the jury, "This means defendant's acts were part of one continuous criminal act." [4]

■■■ It is well established that the trial judge may, in his discretion, give additional instructions in response to a jury's question on any point of law. Minn.R. Crim.P. 26.03, subd. 19(3). The court has the discretion to decide whether to amplify previous instructions, reread previous instructions, or give no response at all. *Id.* The only real limitation placed on the trial court is that the additional instruction may not be given in such a manner as to lead the jury to believe that it wholly supplants the corresponding portion of the original charge. *Strobel v. Chicago, Rock Island & Pacific Railroad Co.*, 255 Minn. 201, 204–05, 96 N.W.2d 195, 199 (1959). Naturally, it is preferable that the court deliver a complete and concise original charge, but if a jury is confused, additional instructions clarifying those previously given may be appropriate since "the interests of justice require that the jury have a full understanding of the case and the rules of law applicable to the facts under deliberation." *Stayberg v. Henderson*, 277 Minn. 16, 19, 151 N.W.2d 290, 292 (1967).

■■■ Both instructions given in this case were correct statements of the law. The second instruction was merely a clarification of the first. While the better practice

---

**4.** This was an instruction originally requested by the state as a part of the final jury instructions. The trial court, however, denied the request at that time. Defense counsel asserted in his closing argument that the jury should define "while" as "during" or "at the time."

would have been to include the clarifying instruction in the final charge, we do not believe that the instructions to the jury as given created a prejudicial error. *See Rauk v. Vold*, 268 Minn. 56, 63, 127 N.W.2d 687, 692 (1964). Even had defense counsel argued the effect of the clarifying instruction, the outcome would have been the same.

Affirmed.

WAHL, J., dissents.

WAHL, Justice, dissenting.

The crux of this appeal is whether the confession of Marshall Donald Murphy was obtained in violation of his privilege against compelled self-incrimination under article I, section 7 of the Minnesota Constitution. We decided *State v. Murphy* on the basis of federal constitutional law, holding that any failure on Murphy's part to claim the privilege against self-incrimination when he was questioned by his probation officer without *Miranda* warnings did not bar his later reliance on the privilege when he sought suppression of his confession. 324 N.W.2d 340, 344 (Minn.1982). We recognized, as had the Supreme Court of Ohio, that the heavy psychological pressure on released offenders to answer inquiries made by their supervising officers is sufficient to render the interrogation inherently coercive. *Id.* at 343 (citing *State v. Gallagher*, 38 Ohio St.2d 291, 313 N.E.2d 396, 400 (1974), *cert. granted*, 420 U.S. 1003, 95 S.Ct. 1445, 43 L.Ed.2d 761, *remanded*, 425 U.S. 257, 96 S.Ct. 1438, 47 L.Ed.2d 722, *on remand*, 46 Ohio St.2d 225, 348 N.E.2d 336 (1976)). We relied on the facts that the meeting with the probation officer was compulsory, that Murphy was under court order to respond truthfully to his probation officer's questions, and that the officer had substantial reason to believe Murphy's answers would be incriminating. 324 N.W.2d at 344. The United States Supreme Court, reversing our decision, concluded "since Murphy revealed incriminating information instead of timely asserting his Fifth Amendment privilege, his disclosures were not compelled incriminations" under the United States Constitution and could be used against him in a criminal prosecution. *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 1149, 79 L.Ed.2d 409 (1984). After remand by this court and before trial began, Murphy timely moved to suppress his statements to his probation officer on the basis that they were obtained in violation of article I, section 7 of the Minnesota Constitution.

Today the majority holds that, the federal and state compelled self-incrimination constitutional provisions being identical, and nothing in the philosophy of the Minnesota criminal justice system with regard to the unique relationship between probationer and probation officer requiring a contrary result, "the interpretation given by the United States Supreme Court of the privilege against self-incrimination under the federal constitutional provision is also a correct statement of the law under article 1, section 7 of the Minnesota Constitution." *Majority*, at 771. I must respectfully disagree. Our own prior cases interpreting article I, section 7 do not support either the substance or breadth of such a holding.

## I.

The majority opinion, quoting *State v. Fuller*, 374 N.W.2d 722 (Minn.1985), recognizes this court is the final authority on the interpretation and enforcement of our state constitution. Though we have on occasion found the views of the United States Supreme Court persuasive, we are not obliged to adopt the United States Supreme Court's construction of a federal constitutional provision in interpreting our own constitution even if the language of a state constitutional privilege is identical. *See State v. Opperman*, 247 N.W.2d 673, 674–75 (S.Dak. 1976). Commentators Fleming and Nordby have noted that "[i]dentical meaning should not be implied merely because there is identical language." Fleming & Nordby, *The Minnesota Bill of Rights: "Wrapt in the Old Miasmal Mist,"* 7 Ham.L.Rev. 51, 68 (1984). They quote Justice Stanley Mosk of the California Supreme Court:

It is a fiction too long accepted that provisions in state constitutions textually identical to the Bill of Rights were intended to mirror their federal counterpart. The lesson of history is otherwise: the Bill of Rights was based upon the corresponding provisions of the first state constitutions, rather than the reverse.

*Id.* at 68–69 (quoting *People v. Brisendine,* 13 Cal.3d 528, 550, 119 Cal.Rptr. 315, 329, 531 P.2d 1099, 1113, (1975)). Those first state constitutions, and article I, section 7 of the Minnesota Constitution, embody our abiding belief as a people that the state cannot be permitted to obtain a criminal conviction by words compelled from the mouth of the accused. "This guaranty," we have said, "courts should zealously guard." *State v. Rixon,* 180 Minn. 573, 576, 231 N.W. 217, 218 (1930). Long before "taking the Fifth" became a familiar household phrase, this court was interpreting article I, section 7 of Minnesota's constitution, in the context of whether a criminal indictment must be quashed because it was based on testimony of the accused obtained in a grand jury proceeding, without reference to the fifth amendment of the federal constitution. In 1871 this court set aside an indictment against a defendant subpoenaed by a grand jury and examined as a witness as to a criminal charge against him. We held an indictment obtained in these circumstances violated the state constitutional protection against compelled self-incrimination. *State v. Froiseth,* 16 Minn. 296 (Gil. 260) (1871).[1] Not until 1892 did the United States Supreme Court hold the federal constitution provided protection against self-incrimination to grand jury witnesses. *Counselman v. Hitchcock,* 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110 (1892).

Similarly, Minnesota's law on waiver of the privilege against compelled self-incrimination developed independently of federal constitutional interpretation. The state constitutional privilege against compelled self-incrimination is absolute when claimed, but may be waived. *See State v. Falcone,* 292 Minn. 365, 195 N.W.2d 572 (1972); *State v. Iosue,* 220 Minn. 283, 19 N.W.2d 735 (1945). This privilege may be waived orally, in writing, or by conduct. *State v. Berry,* 298 Minn. 181, 184, 214 N.W.2d 232, 234 (1974).[2] A waiver is effective, however, only if found to have been made voluntarily and with a clear understanding of the possible consequences. *Id.* It must be made "in a frame of mind wholly 'free from any sense of compulsion.'" *Iosue,* 220 Minn. at 296, 19 N.W.2d at 741. Involuntariness, which prevents effective waiver in this state, may result from physical compulsion, e.g. fear for personal safety or mental compulsion, as where a potential defendant is mistaken in believing he or she has been assured of immunity for testifying before the grand jury. *Berry,* 298 Minn. at 186, 214 N.W.2d at 235; *see also State v. Gardiner,* 88 Minn. 130, 92 N.W. 529.[3] Where an accused is compelled to

---

1. In *State v. Gardiner,* we made clear that the state constitutional guarantee against compelled incrimination "must receive a liberal construction, to the end that personal rights may be protected." 88 Minn. 130, 139, 92 N.W. 529, 533 (1902). Furthermore, that constitutional guarantee "not only protects a person from being compelled to give direct evidence tending to establish his guilt, but also from giving any circumstance or link in the chain of evidence which may tend to convict him of a crime." *Id.* By 1930 we considered it "settled law" in the state that "where a grand jury by subpoena compels the accused to attend and testify concerning his connection with the crime under investigation, an indictment returned by such jury against such accused will be quashed, because in violation of our constitutional guaranty that no person 'shall be compelled in any criminal case to be a witness against himself.' (article I, § 7)." *Rixon,* 180 Minn. at 575, 231 N.W. at 218. (citations omitted). In *Rixon,* the defendants had been required by subpoena to appear before deputies of the State Fire Marshall and answer questions implicating them in arson. This court quashed an indictment based on a transcription of that interrogation that had been given to the grand jury.

2. Whether a waiver has been made is a factual determination. *Berry,* 298 Minn. at 184, 214 N.W.2d at 234.

3. It is not necessary that the defendant has been intentionally misled to induce a waiver, as appears to have been the case in *Gardiner,* to be found to have acted involuntarily and thus, under Minnesota law, to be unable to make an

testify, the testimony may not be used against him or her in a criminal procedure unless this knowing, voluntary and intelligent waiver is affirmatively shown.

In contrast, the line of decisions of the United States Supreme Court on loss of the federal constitutional privilege against compelled self-incrimination stands for the proposition that if a witness under compulsion to testify makes an incriminating disclosure instead of claiming the privilege, the government is viewed as not having "compelled" the incrimination. *Garner v. United States*, 424 U.S. 648, 654–55, 96 S.Ct. 1178, 1182–83, 47 L.Ed.2d 370 (1976) (discussing *United States v. Kordel*, 397 U.S. 1, 7–10, 90 S.Ct. 763, 767–69, 25 L.Ed.2d 1 (1970)). Lack of compulsion to speak is presumed under federal constitutional law. "[I]f [a witness] chooses to answer, his choice is considered to be voluntary since he was free to claim the privilege * * *." *Minnesota v. Murphy*, 104 S.Ct. at 1143. Because failure to claim the privilege is considered sufficient in the ordinary case to prove no compulsion, no knowing or intelligent waiver of the privilege need be shown. "Our cases do not reflect an uncritical demand for a knowing and intelligent waiver in every situation where a person has failed to invoke a constitutional protection." *Schneckloth v. Bustamonte*, 412 U.S. 218, 235, 93 S.Ct. 2041, 2052, 36 L.Ed.2d 854 (1973). Only where circumstances can be shown which "impermissibly foreclose a free choice to remain silent" is a witness' failure to claim

the privilege excused when he or she later wants to prevent the use of incriminating statements in a criminal prosecution. *Minnesota v. Murphy*, 104 S.Ct. at 1143.[4]

These different approaches—whether lack of compulsion is presumed, as under the federal constitution, or must be affirmatively shown, as under this state's constitution—are also reflected in different Minnesota and federal rules as to the warnings of constitutional rights that must be given witnesses before a grand jury. In Minnesota, if a grand jury witness is a potential defendant, the prosecutor must advise the witness prior to questioning that he or she may be implicated by the testimony and should seek legal advice concerning constitutional rights. *Falcone*, 292 Minn. at 373, 195 N.W.2d at 577. Incriminating grand jury testimony may be used by the prosecution in a later criminal trial only where the trial court finds the defendant was warned before testifying to the grand jury and voluntarily waived immunity knowing that the testimony might lead to indictment and be admissible at a subsequent criminal trial. *Id.* at 373, 195 N.W.2d at 578. By contrast, in *United States v. Washington*, the United States Supreme Court stated that a grand jury witness who is a potential defendant need not be warned before testifying that indictment and criminal conviction could result from incriminating testimony. 431 U.S. 181, 186, 189, 97 S.Ct. 1814, 1818, 1819–20, 52 L.Ed.2d 238 (1977). Nor need it be shown that a grand jury witness knowingly

---

effective waiver of the right not to be compelled to self-incriminate. *Berry*, 298 Minn. at 186, 214 N.W.2d at 235. We have made clear, however, that a prosecutor may not use devious means to obtain a waiver of immunity from the potential defendant for grand jury testimony which the prosecutor later offers as evidence against the accused at a criminal trial. *Falcone*, 292 Minn. at 373, 195 N.W.2d at 577. In Murphy's case the probation officer, in questioning him about the murder, told him her sole purpose for the interrogation was to determine his further need for treatment, though she had previously decided with her supervisor that she would go to the police with any information she obtained. This conduct, while proper for probationary purposes, has different legal implications with regard to the issue of whether Murphy knowingly

and voluntarily waived the right not to incriminate himself in a new criminal charge.

4. The United States Supreme Court has identified certain well-defined situations in which some identifiable factor was held to deny the individual a "'free choice to admit, to deny, or to refuse to answer.'" *Minnesota v. Murphy*, 104 S.Ct. at 1143 (quoting *Lisenba v. California*, 314 U.S. 219, 241, 62 S.Ct. 280, 292, 86 L.Ed. 166 (1941)). These include inherently coercive settings, e.g. custodial interrogation as in *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S.Ct. 1602, 1624, 16 L.Ed.2d 694 (1966), or where assertion of the privilege is penalized, as in *Garner*, 424 U.S. at 661, 96 S.Ct. at 1186.

waived the privilege against compelled self-incrimination. *Garner*, 424 U.S. at 654 n. 9, 96 S.Ct. at 1182 n. 9. Under the federal constitution, the only test is whether, considering the totality of the circumstances, the free will of the witness can be shown to have been overborne. *Rogers v. Richmond*, 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760 (1961). In summary, under the federal law, compulsion must be affirmatively proved while under Minnesota law, it is voluntariness that must be affirmatively shown.

## II.

This case, involving Murphy's interrogation by his probation officer and the use of incriminating statements obtained therefrom as the basis of his criminal indictment and conviction, is analogous to our cases involving interrogations of grand jury witnesses and the use of incriminating statements obtained therefrom as the basis of criminal indictments against those witnesses. It is analogous to *Rixon*, where a transcription of an interrogation under subpoena of accused arsonists by state fire marshall's deputies was submitted to and used by a grand jury to obtain their criminal indictment. 180 Minn. 573, 231 N.W. 217. Murphy was compelled by an order of the district court to meet with his probation officer when and where she summoned him. His probation officer was an official representative of the court. She had advised him, by letter of July 14, 1981, that his failure to contact her and set up an appointment as requested would result in an immediate order for his arrest and a probation revocation hearing. Like those accused witnesses in *Froiseth, Gardiner*, and *Rixon*, who were compelled by oath to tell the truth, Murphy was under court order to answer all of his probation officer's questions truthfully. In this setting, a required meeting with his probation officer in her office at which she unexpectedly and without a warning of his rights confronted him with questions regarding his commission of a murder, it is clear Murphy *could* have claimed the privilege against compelled incrimination under either the federal or the state constitution. *See Minnesota v. Murphy*, 104 S.Ct. at 1143, 1148; *Rixon*, 180 Minn. at 575, 231 N.W. at 217–18. He did not claim the privilege by refusing to answer the probation officer's questions but instead responded, truthfully we presume, as required by his probation order. Under these circumstances, were his incriminating statements compelled for purposes of article 1, section 7?

Under federal constitutional law Murphy lost his fifth amendment privilege by failing to assert it and the United States Supreme Court has found that the circumstances were not such as to overbear his free will, thereby excusing his failure to assert the privilege. Under Minnesota law, however, with or without a warning,[5] the State must prove that Murphy waived his article 1, section 7 privilege against compelled self-incrimination voluntarily, with a clear understanding of the possible consequences and in a frame of mind wholly free from any sense of compulsion. *Berry*, 298 Minn. at 184–85, 214 N.W.2d at 234; *Iosue*, 220 Minn. at 295–96, 19 N.W.2d at 741. Murphy testified that he did not feel free to leave the meeting when confronted because that would have violated the conditions of his probation order. He testified that he did not know he had a right to refuse to answer the probation officer's questions or to consult an attorney before answering them. He testified that because his probation officer put the entire conversation in the context of what a future treatment plan for him should be, it did not occur to him that she would go to the police with what he said. He stated further that he had had two probation officers before her and neither had ever gone to the police with anything he said. The credibility of this testimony is strengthened by the fail-

---

**5.** Before being interrogated by the fire marshall's deputies, the accused in *Rixon* were warned that incriminating questions need not be answered. 180 Minn. at 575, 231 N.W. at

217. Even though they were warned, criminal indictments based on incriminating testimony of the accused were quashed as having been compelled. *Id.*

ure of the probation officer to advise Murphy of his rights against compelled incrimination before she conducted the interrogation. A knowing, voluntary, intelligent waiver cannot be presumed and has not been affirmatively shown in this case. Murphy's statements are compelled incriminations under article 1, section 7 of the Minnesota Constitution and cannot serve as the basis of his criminal conviction. A reversal on this ground is required and the case remanded for a new trial.