**STATE of Minnesota, Plaintiff (C7–88–2023)—Respondent,**

**v.**

**Violet JOHNSON, et al., Defendants,**

**Leroy Varney, et al., Appellants (C9–88–2038)—Petitioners (C3–88–2052),**

**Robert Joseph Olson, Appellant (C3–88–2049)—Petitioner (CX–88–2050),**

**Angela Marie Doyle, Appellant (C6–88–2093).**

**Nos. C7–88–2023, C9–88–2038, C3–88–2049, CX–88–2050, C3–88–2052 and C6–88–2093.**

Supreme Court of Minnesota.

June 2, 1989.

Rehearing Denied June 30, 1989.

Nancy K. Olkon, Minneapolis, for Angela Doyle.

Robert J. Sorenson, and Daniel E. O'Brien, Public Defender's Office, Minneapolis, for Robert Olson.

Warren Sagstuen, Asst. Public Defender, Minneapolis, for Leroy Varney, et al.

Michael J. Colich, Colich & Cahill, Minneapolis, for Roderick Miller.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, and Thomas L. Johnson, Hennepin County Atty., Minneapolis, for respondent.

Hubert H. Humphrey, III, Atty. Gen., Robert Stanich, Sp. Asst. Atty. Gen., St. Paul, amicus Atty. Gen.

YETKA, Justice.

Defendants were indicted by Hennepin County grand juries in November 1987 and March 1988. They moved for a dismissal of the indictments due to numerous prosecutorial errors. The Chief Judge of the Fourth Judicial District appointed a four-judge panel to hear the issues common to all cases. Twenty-two cases were consolidated before the panel, which found numerous errors, but held them all to be harmless and denied defense motions to dismiss the indictments. The panel specifically found that the foreperson of the November grand jury, at the suggestion of the county attorney, contacted a former foreperson about administrative and procedural matters. It certified the following question to this court:

> In ruling on a motion to dismiss based upon facts as found in Paragraph 2

above [contact with former foreperson], should the Court apply harmless error analysis or do these facts constitute error per se mandating dismissal under a fundamental error analysis?

The defendants also petitioned this court for discretionary review and filed a notice of appeal assertedly taken as of right pursuant to *State v. Scruggs,* 421 N.W.2d 707 (Minn.1988). We find the telephone contact to be harmless error, but hold that the cumulative effect of the March 1988 grand jury errors substantially prejudiced defendants, requiring dismissal of their indictments. We also hold that the *Scruggs* decision did not create a pretrial appeal as of right from an indictment.

Today's grand jury has its roots in the English system of courts and justice as it developed in the 12th century.[1] Prior to that, law in England and on the continent consisted of the "inquest" or "inquiry" where an official of the king questioned men under oath about local matters in which the king was interested. Under the reign of Henry II, the inquest ceased being an instrument of royal oppression as it had been under the rule of William the Conqueror and became part of the new English legal system. The accusing, or presenting, jury of that time was the foundation for our modern grand jury. Its function "was not only to examine into the commission of crimes, but to stand between the prosecutor and the accused, and to determine whether the charge was founded upon credible testimony or was dictated by malice or personal ill will." *Hale v. Henkel,* 201 U.S. 43, 59, 26 S.Ct. 370, 372–73, 50 L.Ed. 652 (1906). *See also State v. Iosue,* 220 Minn. 283, 293, 19 N.W.2d 735, 740 (1945); *State v. Grose,* 387 N.W.2d 182, 186 (Minn.App.1986).

The grand jury's historical function of shielding the accused from the prosecutor and ensuring that a charge was based on credible facts became embodied in American law. The United States Constitution and the original Minnesota Constitution contained the language: "No person shall be held to answer for a capital, or other-wise infamous crime, unless on a presentment or indictment of a Grand Jury * * *." U.S. Const. Amend. V *See* Minn. Const. of 1857, Art. 1, § 7.

As used in the United States, the grand jury has gradually developed another, perhaps unfortunate, function: it protects prosecutors from having to make politically unpopular decisions. When hesitant to prosecute, whether for legal or political reasons, a grand jury indictment will let a prosecutor "off the hook." Conversely, a prosecutor can use a grand jury's failure to indict as an excuse not to prosecute. Instead of protecting the accused from the accuser, the grand jury has become a vehicle to shield the county attorney from public opinion.

Our concern is to keep the grand jury as free from taint and improper influence as possible. There is a tendency for prosecutors to view the grand jury as a tool for their own convenience. It is imperative that prosecutors remember that they have the special responsibilities of a minister of justice and not simply those of an advocate. Minnesota Rules of Professional Conduct 3.8 comment (1985).

█ In recent years, we have become increasingly concerned about prosecutorial misconduct in criminal trials. *See, e.g., State v. Merrill,* 428 N.W.2d 361 (1988)• (prosecutor's closing argument tactics criticized as "deplorable"). As a result of the prosecutor's unique relationship with the grand jury, opportunities for influence and manipulation of the process are omnipresent. In *State v. Grose,* the court of appeals noted that "[t]he prosecutor is the person who draws up the indictment, calls and examines the witnesses, advises the grand jury about the law, and is in constant attendance during its proceedings." *Grose,* 387 N.W.2d at 186. Prosecutors, therefore, must exercise extreme caution to ensure that the grand jury retains its independent role in our legal system.

## I.

It was apparently routine practice for the Hennepin County Attorney's office to pro-

---

1. *See* White, *The Making of the English Constitu-* *tion* (1925).

vide grand jury forepersons with the names and telephone numbers of previous forepersons so that they, in the words of the county attorney, could "have a chance to chat directly with them about how did they get this thing moving. And what process did they follow [sic]." The foreperson of the March grand jury did not take the county attorney's suggestion; however, the November foreperson did contact a previous foreperson. The panel found that this unauthorized contact "occurred before any individual's case was presented to the grand jury, and it did not touch either upon the law or upon the facts of any individual case; it was limited to the 'nuts and bolts' of procedure for grand jury deliberation." *State v. Johnson, et al.*, No. 97101–02 at 13 (Henn. Cty., Sept. 16, 1988) (order and memorandum denying motion to dismiss indictments) [hereinafter Memorandum]. The panel then subjected the contact to a harmless-error analysis and found that it was harmless as a matter of law.

We agree with the district court panel that, by introducing former grand jurors into the grand jury process, the county attorney compromised the integrity of the process itself. The four-judge panel, however, split as to whether prejudice must be shown or whether the November indictments should be dismissed per se. The certified question before us asks us to decide the standard by which to review such a clear error.

Appellants would have us analogize the telephone contact to the presence of an unauthorized person in the grand jury room. In Minnesota, the presence of an unauthorized person during presentation of evidence to the grand jury or during its deliberations or votings taints an indictment and no showing of prejudice is necessary for dismissal. *Dwire v. State*, 381 N.W.2d 871, 875 (Minn.App.1986). *See* Minn.Stat. § 628.63; Minn.R.Crim.P. 17.06, subd. 2(1)(f); Minn.R.Crim.P. 18.04. The rationale for this rule was provided by this court long ago:

> The grand jury is supposed to be a fearless and impartial investigator of crime, and to the [sic] more fully accomplish this purpose the law seeks to pro-

vide against every influence of outsiders, and specifies that the mere presence of an unauthorized person when a witness testifies, or when the case is discussed, or the vote taken, is fatal to the indictment.

*State v. Ernster*, 147 Minn. 81, 85, 179 N.W. 640, 642 (1920).

The former foreperson who was contacted was not "present" in the November grand jury room in the literal sense of the word. Because the telephone conversation occurred outside the sanctity of the grand jury and beyond the control of the judge or prosecutor, it was not as inherently prejudicial to the process as the actual presence of an authorized person would be. Nevertheless, the opportunity existed for the former foreperson to influence the proceedings, and that unauthorized contact raises a presumption of prejudice to the defendant.

Minnesota has followed the United States Supreme Court rule of presumptive prejudice with regard to petit juries. In *Mattox v. U.S.*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892), the Supreme Court declared that "[p]rivate communications, possibly prejudicial, between jurors and third persons, or witnesses, or the officer in charge, are absolutely forbidden, and invalidate the verdict, at least unless their harmlessness is made to appear." *Id.* at 150, 13 S.Ct. at 53. In *Remmer v. U.S.*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), the court reinforced this rule and held that any "private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending * * * is, for obvious reasons, deemed presumptively prejudicial." *Id.* at 229, 74 S.Ct. at 451. Minnesota adopted this rule in *State v. Cox*, 322 N.W.2d 555 (Minn. 1982). *See also State v. Sanders*, 376 N.W.2d 196, 205 (Minn.1985). Today, we extend the law to hold that the introduction of former grand jurors into the grand jury process is presumptively prejudicial.

*Cox* recognized that the presumption of prejudice is rebuttable and examined the nature and source of the prejudicial matter, the number of jurors exposed

to it, the weight of other evidence before the jury and the effectiveness of any curative measures. *Cox*, 322 N.W.2d at 559. Likewise, the burden is on the prosecution in this case to prove that the contact between the March foreperson and the former juror was harmless. The prosecution has met its burden by showing, through the deposition of the former foreperson, that the telephone conversation concerned strictly administrative and procedural matters and did not involve the law to be applied or the facts of any cases. The content of the conversation and the fact that it took place prior to the presentment of any cases makes such contact harmless.

## II.

■ We turn next to the March 1988 grand jury process.[2] While there was no contact with the previous grand jury foreperson in that proceeding, we must analyze defendants' other allegations of prosecutorial misconduct. Defense counsel cites a total of 26 alleged irregularities in the indictment process. We will not discuss all the complaints, but set forth and concentrate on the four areas where the panel found error, albeit harmless error.

### Subversion of Independence of Grand Jury

The panel found four instances where the county attorney subverted the independence of the grand jury:

1. The county attorney said that his office would send squad cars to seek out absent jurors. The panel found:

> The county attorney is not by law the overseer of the grand jury. He has no authority, by statute or rule, to seek out missing jurors. The importance of grand jurors' regular attendance certainly can be conveyed to them without the veiled threat in these remarks. Although we accept the county attorney's assurance that he intended to be humorous, the comment improperly elevates the county

attorney's rank in the grand jury proceedings over the rank of the jurors themselves, by suggesting a supervisory power that does not reside with the county attorney. It is a misstatement of law, and it is error.

Memorandum at 6–7

2. The county attorney told the grand jury that they should consider the county's higher office standard of probable cause in deciding whether to indict. The panel found error:

> [I]t is improper for the county attorney to refer the grand jury to his "office standard," which, whatever it might be, specifically should *not* affect grand jury decisions. It is of the essence that the grand jury stand between the citizen and the State, that it act independently, and that it not defer to the prosecutor or to any other person or institution that might seek to influence its work.

*Id.* at 7.

3. The county attorney explained what happens when a first-degree murder charge is not proven at trial. The panel disapproved of this discourse:

> [Because] the grand jury is invited to see itself as part of the prosecutorial function, this time by working with the county attorney so as to avoid a situation where, due to a hypothetical trial judge's failure to instruct on a lesser charge, a person guilty of a lesser charge goes free.
>
> This excursion into trial strategy is not instruction as to the law which the grand jury should consider in its deliberations. It is error.

*Id.* at 8.

4. The assistant county attorney referred to the standard of probable cause as a belief that "we have a reasonable likelihood of conviction based upon the most logical defense." He asked that the grand jury not overwhelm him with charges and

2. The district court panel's charge to address issues "common to all pending Hennepin County homicide cases in which the defense chose to raise alleged defects in the indictment process" is misleading. We cannot assume that the errors discussed below occurred at both the November 1987 and March 1988 grand juries because only the latter proceeding was recorded. The errors discussed in this section are unique to the March 1988 grand jury.

told them: "We have other obligations and we wish you to come on out as reasonable people and peg it just as close to where it should be as possible." The panel found:

> The phrase "reasonable likelihood of conviction based upon the most logical defense" articulates a standard it is hard to believe anyone but a trial lawyer could apply: how can lay jurors sort out "the most logical defense," and from what foundation are they to assess "likelihood of conviction?"
>
> The statement, as a whole, implies that the grand jurors are quasi-prosecutors and that they should be considerate of the county attorney's office. Neither proposition is legally correct. This comment is error.

*Id.* at 9.

Overall, the panel was troubled by the tone of the prosecutors' remarks above, but concluded that they were isolated comments, not forceful enough to undermine the institutional independence of the grand jury. It held that the errors were harmless as a matter of law.

### Erroneous or Misleading Instructions

The panel found several errors in the county attorney's instructions as well. In explaining lesser-included offenses to the grand jury, the assistant county attorney misstated the law:

> "Every lesser degree of murder is intended by the statute to be characterized as an included offense." This both over-simplifies (although homicide charges are arranged on a bigger-to-smaller range, not every lesser is included in every greater charge) and over-complicates (how does a lay juror define "included offense," when judges and lawyers sometimes fail to do so correctly?) the law for the grand jury. This is one more example of a situation where a prepared script would serve to discipline the instructing attorneys. The comment is error, although its difficulty most likely would cause jurors to overlook it, rather than to be influenced by it.

*Id.* at 25. The panel also found that the prosecutor asked the grand jury at least three times to consider plea negotiations in charging. He framed his discussion in terms of what "we" [the county attorney's office] need from the grand jury. The panel remarked:

> This personal, subjective tone is inappropriate.
>
> As we have stated elsewhere in this memorandum, the grand jury generally should not be instructed to consider how its decision will impact a part of the criminal process that is outside its scope. Certainly, it should not be urged to make a case more agreeable for the prosecution. Both of these errors were committed by the assistant county attorney * * *.

*Id.* The panel found the errors relating to erroneous or misleading instructions to be harmless as a matter of law.

### Informational Packet

The county attorney distributed to new jurors an informational packet partially prepared by former grand jury members. The panel held, in general, that incorporating material prepared by lay persons into the informational booklet was error.

Specifically, the panel identified as erroneous the packet's implications that a suspect will be released if no indictment is returned and that the county attorney can resubmit the case to the grand jury without court permission. The panel also found error because the packet suggested that the grand jury take a straw vote before its final vote as well as participate in plea bargaining. The material also contained a case citation, which the panel found improper to provide to a lay jury and, therefore, in error. The panel concluded that the errors relating to the informational packet were harmless as a matter of law.

### Comments on Newspaper Coverage

The county attorney mentioned that the jurors might read about cases to come before them in the newspaper. The panel found that "[i]t was error for the county attorney to refer to newspaper coverage of current homicide cases without strongly discouraging the grand jurors from exposing themselves to media coverage of matters that would come before them." Mem-

orandum at 33. It also found that the net effect of the county attorney's comments was to enhance the significance of newspapers, however, it did not find reversible error.

When the panel evaluated the cumulative effect of the numerous errors in the March 1988 grand jury, it still held them to be harmless. We disagree with its conclusion.

Cumulative error exists when the "cumulative effect of the * * * errors and indiscretions, none of which alone might have been enough to tip the scales, operate to the defendant's prejudice by producing a biased jury." *United States v. Samango*, 607 F.2d 877, 884 (9th Cir.1979). In *State v. Grose*, 387 N.W.2d 182 (Minn.App.1986), the court addressed a plethora of improper comments, misstatements and procedural violations by the prosecutor. In upholding the dismissal of the indictments, the court held that, "[t]aken cumulatively * * * these actions may have improperly influenced the grand jury, preventing it from acting as an independent body." *Id.* at 190. The errors in this case, although not of the magnitude in *Grose*, justify the same result. Threatening members of the grand jury that they could be picked up by police, handing out instructions from previous grand jurors, and giving inaccurate instructions on probable cause and the effect of a failure to indict are the types of errors that seriously undermine the integrity and independence of the grand jury.

Prosecutors must not take advantage of their role as representatives of the state to influence unduly or unfairly a grand jury's decisions.[3] As we concluded in *State v. Inthavong*, 402 N.W.2d 799 (Minn.1987): "[T]his is one of those instances where the error is fundamental and the integrity of the grand jury system cannot afford the assumption that the jurors were not misled." *Id.* at 803. We thus find that the indictments before us from the 1988 grand jury were not returned as required by law and prejudiced the substantial rights of defendants. Minn.R.Crim.P. 17.06, subd. 2(2)(a). We order representment with regard to the defendants who were indicted by the March 1988 grand jury and remain parties to this appeal.[4]

It is true, as appellants note, that today's harmless error can become the standard practice of tomorrow. Thus, while we recognize that dismissing indictments may result in serious ramifications, we know of no other way to preserve the integrity of the judicial process and maintain the independence of the grand jury. With the vast state resources available for the investigation and prosecution of crime, there is no need to disregard the safeguards which took 700 years to develop within the English and American common law systems. The grand jury is not intended to be a tool of the prosecution or the defense. It is an arm of the judiciary and, as such, it shall be used in a fair, impartial and independent manner or not at all. This decision is necessary to protect not only the defendants, but all of us as well.

### III.

Appellants filed a notice of appeal pursuant to *State v. Scruggs*, 421 N.W.2d 707 (Minn.1988). In *Scruggs*, this court stated:

It flows from this presumption that a criminal defendant bears a heavy burden when seeking to overturn an indictment. This is especially true where, as here, the challenge is brought after appellant has been found guilty beyond a reasonable

---

**3.** *See ABA Standards For Criminal Justice* 3–3.5 (1979):

(a) Where the prosecutor is authorized to act as legal adviser to the grand jury, the prosecutor may appropriately explain the law and express an opinion on the legal significance of the evidence but should give due deference to its status as an independent legal body.

(b) The prosecutor should not make statements or arguments in an effort to influence grand jury action in a manner which would be impermissible at trial before a petit jury.

(c) The prosecutor's communications and presentations to the grand jury should be on the record.

*Id.*

**4.** We emphasize that our analysis applies only to these pretrial appeals. We do not suggest that defendants indicted by this grand jury who later pled guilty or were convicted are entitled to representment.

doubt following a fair trial. *A more appropriate method of challenging an indictment is an appeal before trial on the merits.*

*Id.* at 717 (emphasis added).

Prior to *Scruggs,* this court held that an order denying a motion to dismiss an indictment is not appealable. *State v. Robinson II,* 266 Minn. 574, 123 N.W.2d 694 (1963). Appellants claim that *Scruggs* created a new pretrial right of appeal from an indictment. In its amicus brief, the state argues conversely that no appeal as of right was created. Under Minn.R.Crim.P. 28.02, subd. 2, a defendant only has an appeal as of right from a final judgment. A party may appeal an order in very few cases and, therefore, usually must file a discretionary appeal if final judgment has not been entered. *See* Minn.R.Crim.P. 28.02, subd. 3.

▆ This issue is not directly before us today because we chose to grant discretionary review to the appealing defendants. However, because it was raised and briefed by the parties and has apparently caused some confusion in the criminal bar, we will clarify the language in *Scruggs.* We did not intend to change existing law in *Scruggs.* Defendants do not have an appeal of right from an order denying the dismissal of an indictment. It is sufficient that, in extraordinary circumstances, the right to a discretionary appeal exists, and the court of appeals should be willing to hear such cases.

Thus, upon discretionary review, we hold that the presumptive prejudice that attached to the telephone contact between the grand jury foreperson and a former person was proven to be harmless beyond a reasonable doubt and affirm the trial court's refusal to dismiss those indictments. We reverse the trial court with regard to the March 1988 indictments and hold that, under state law, the cumulative effect of the errors substantially prejudiced the rights of defendants by impinging on the independence and integrity of the grand jury system.

SIMONETT, J., dissents.

WAHL, J., concurring in part; dissenting in part.

SIMONETT, Justice (dissenting in part).

I join in Parts I and III of the court's opinion but respectfully dissent from Part II.

The four-judge panel carefully reviewed the long list of irregularities claimed by the defendants. Some of the claims were dismissed as innocuous; some were thought to be blemishes which should be avoided; and some were found to be error. Whether considered individually or collectively, the errors were found by the panel to be harmless as a matter of law. The panel, nevertheless, carefully discussed each claimed irregularity because it saw this as an appropriate occasion to make a statement as to how grand jury proceedings henceforth should be conducted, so as "to make the process as error-free as possible in the future." The panel saw no reason, however, to dismiss the indictments handed down by the March grand jury, and neither do I.

A few examples may be cited to give a flavor of the proceedings. The county attorney told the jury he would send a squad car to seek out absent jurors. This comment was made while emphasizing to the jurors the necessity for having a quorum to do business and was said (as the panel found) humorously. It was no more error, in my opinion, than the county attorney's instruction to the jury not to be "lazy listeners" (a remark not objected to) or telling the jurors they would all be made "scholars in criminal law" (an obvious exaggeration intended humorously which the panel said was not error). Ironically, if prosecutors try to be folksy or jocular to put new grand jurors at ease, they may be accused of seeking to ingratiate themselves with the jury. If they warn or admonish jurors about inattention, they may be charged with intimidation. If they misstate the law inadvertently, they are attempting to mislead; and if they are thought to be too helpful, they are manipulating.

During a discussion of the criminal process, the subject turned to, among other things, discussion of proof beyond a reasonable doubt,[1] plea negotiations,[2] and lesser-included offenses. Thus the assistant county attorney stated: "Every lesser degree of murder is intended by the statute to be characterized as an included offense." This remark, said the panel, was an oversimplification, but one more likely to be overlooked than to mislead. There were other similar irregularities.[3]

None of the alleged irregularities, it should be noted, occurred during the presentation of a particular case against a particular defendant. The "errors" occurred at the initial orientation session conducted by the prosecutor with the new grand jurors and after they had been instructed by the judge. The jurors knew they were receiving only a preliminary overview of what they would be doing in the months ahead. Criminal law is complicated, even for lawyers, and almost any statement made about it is an oversimplification; but—keeping in mind these are remarks to a grand jury, not a petit jury—I fail to see where there was any harm, especially when it was clear to the jurors that they would receive further explanations of the law when the cases were presented.

The main concern in this appeal is whether the "tone" and overall effect of the prosecutor's orientation talk was to undermine the independence of the grand jury.

A grand jury must make its own evidentiary evaluations and decisions. By probing the evidence, a grand jury can expose the strengths and weaknesses of a case.[4] On the other hand, if the grand jury indicts a weak case, it can put the government to an expensive and wasteful prosecution to no one's benefit. Finally, if the occasion arises, it must be prepared to shield an accused from accusations stemming from a prosecutor's malice or personal bias. In other words, the grand jury serves a number of purposes and is useful in bringing to bear the conscience of the community at the point where the criminal justice system is sought to be invoked.

If the grand jury is to be worth its salt, it must be aware of and be willing to assert its independence. Yet, it is the prosecutor who prepares the case, calls and examines the witnesses, and advises the grand jury on the law. The prosecutor's presence in grand jury proceedings is made even more prominent by the conspicuous absence of defense counsel. There is an element of interdependence between the grand jury and the prosecutor, which, realistically, cannot be ignored and will not disappear whatever the incantations used.

The grand jury is not a prosecutor; it is not the county attorney's "rubber stamp." Neither is the prosecutor the sovereign, but only the sovereign's representative. The relationship between the prosecutor and the grand jury is not that of partners. Perhaps the relationship is best described,

1. When the county attorney mentioned his office used the higher standard of reasonable likelihood of obtaining a conviction rather than the standard of probable cause, he was attempting to point out that at trial the prosecutor would have to prove guilt beyond a reasonable doubt.

2. The county attorney told the jurors they were not to consider plea negotiations in deciding whether or not to indict; that his office's policy was not to negotiate a plea but to prosecute the offense for which indicted, although in some instances, as where a key witness dies or changes his testimony before trial, negotiations might then be appropriate.

3. The informational packet prepared by former grand jurors dealt mainly with "helpful hints" on the importance of maintaining secrecy, being courteous to witnesses, and managing time. While the packet mentioned use of an explorato-

ry "straw vote" on occasion, it also stated, "A final vote is final, and may not be taken again because some members are unhappy with the result." On the other hand, some statements in the packet should not have been made, such as implying a suspect will be released if not indicted.

4. "[T]he grand jury gives the prosecutor a feel for how the case will appear to a petit jury. The grand jury's reaction may lead the prosecutor to re-evaluate the evidence supporting a particular case. As a result, the prosecutor may either strengthen the proof or drop the contemplated indictment." Sullivan and Nachman, *If It Ain't Broke, Don't Fix It: Why the Grand Jury's Accusatory Function Should Not Be Changed*, 75 J.Crim.L. & Criminology 1047, 1053 (1984)

as defendants urge, as an attorney-client relationship, although even this description needs definition. As the four-judge panel noted, one way to maintain a correct relationship between the prosecutor and the grand jury is by more trial court supervision. The practice now of recording grand jury proceedings should also be a helpful deterrent against improprieties. It would help, too, if the prosecutor was required from time to time to remind the jury of the lines of demarcation between them. The jurors should hear this from the county attorney as well as the judge.

From my review of the transcript of the grand jury proceedings, I see no reason to think the March grand jury's independence was undermined. Nothing sinister occurred. At most, we have the county attorney treating the jurors with undue familiarity while trying to make the criminal process less mysterious and formidable. Several times the county attorney stressed the grand jury's independent role.[5] This case is quite unlike *State v. Grose*, 387 N.W.2d 182 (Minn.App.1986), where there was egregious misconduct and obvious bias by the county attorney in the presentation of the case against the defendant. We do not have here the blatant overreaching of a prosecutor that appears in *United States v. Samango*, 607 F.2d 877 (9th Cir.1979). We have no "systematic and pervasive" misconduct that raises "a substantial and serious question as to the fundamental fairness of the grand jury process." *Bank of Nova Scotia v. United States*, — U.S. ——, 108 S.Ct. 2369, 2376, 101 L.Ed.2d 228 (1988).

This is not to say there were not irregularities in this case which need to be corrected, but simply to put matters in a common sense perspective. I should not care for this court's opinion to be construed as an invitation to search the transcript of grand jury proceedings for every imperfection (for no proceeding or trial is ever perfect) in the hope that a long enough list will constitute prejudicial cumulative error.

We need, too, to give credit to the common sense of jurors. We tend at times to underestimate their savvy. The foreman who had been contacted by the foreman of the November grand jury wrote a letter which is part of the record on this appeal. He said he was reminded of George Bernard Shaw's comment: "All professions are a conspiracy against the laity." I should not like to believe this is true, but sometimes I wonder.

I would affirm the four-judge panel in all respects.

WAHL, Justice (concurring in part, dissenting in part).

I agree with the majority opinion, as set out in Part II, that the indictments before us from the March 1988 grand jury must be dismissed because they were not returned as required by law and prejudiced the substantial rights of defendants. I must respectfully dissent, however, from the holding in Part I, with regard to the November 1988 grand jury, that the introduction of former grand jurors into the grand jury process, though presumptively prejudicial, is harmless error. Because the integrity of the grand jury is essential, I would apply the harmless error rule only to a defect or imperfection in matters of form. See Minn.R.Crim.P. 17.06, subd. 1. All other errors, including the introduction of former grand jurors into the grand jury process, should be deemed fundamental errors requiring dismissal of the indictment.

---

5. In telling the jurors about their right to ask questions, for example, the county attorney said: "So ask the questions. Don't be in any way hesitant about doing it. That's real important." T. 26.

Again: "Now, after its presented then, you go into deliberations. That's when you call the shots entirely. Court reporter leaves the room. We leave the room. And you're here alone." T. 27.

And again, from the assistant county attorney: "You are the final deciders on the appropriate charge if we present to you. And what we previously charged is of no consequence. You are an independent body and should make the decision based upon what you hear during the grand jury presentation."